1

2

3

4

5

6

7          UNITED STATES DISTRICT COURT

8          NORTHERN DISTRICT OF CALIFORNIA

9

10   JESUS RODRIGUEZ,                          No. C 12-4714 SI (pr)

11            Plaintiff,                       **ORDER OF DISMISSAL WITH**
                                               **LEAVE TO AMEND**
12        v.

13   R.T.C. GROUNDS, et al.,

14            Defendants.
                                        /
15

16                           **INTRODUCTION**

17        Jesus Rodriguez, an inmate currently housed at the California Substance Abuse Treatment

18   Facility in Corcoran, filed a *pro se* civil rights action under 42 U.S.C. § 1983.  His complaint is

19   now before the court for review under 28 U.S.C. § 1915A.

20

21                            **BACKGROUND**

22        This case concerns a power struggle within an inmate religious group in which plaintiff

23   did not prevail.  In a nutshell, the facts alleged and shown by the exhibits to the amended

24   complaint are these: Rodriguez is a convert to the Native American religion.  Other inmates who

25   were born Native American created bylaws for the Native American religious group in the

26   special needs yard where he was housed.  The bylaws made several of the lifelong Native

27   Americans the leaders and set out membership criteria that put converts (including Rodriguez)

28   at a disadvantage.  Prison officials allowed this to happen.  Rodriguez campaigned to show other

     inmates and prison officials that the self-designated inmate leaders of the Native American

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

religion were wrong and that his view – i.e., that the religion should be open to all inmates rather than those born Native American – was right. That irritated the self-designated inmate leaders in the Native American religion and, according to Rodriguez, prompted them to falsely report to prison officials that his disruptive force would lead to a riot in the prison yard. Prison officials transferred him to another prison as a result of these reports. In this action, Rodriguez asserts claims against prison officials for violations of his religious freedom rights, his Fourteenth Amendment rights, and his right not to be retaliated against for the exercise of his constitutional rights.

The amended complaint alleges the following:

On September 23, 2009, Rodriguez was transferred to the sensitive needs yard ("SNY") at the Correctional Training Facility ("CTF") in Soledad. The SNY consisted of the A Yard and B Yard at the CTF's North Facility. The inmates lived in separate yards, but programmed together. Amended Complaint, p. 4.

Shortly after his arrival in the SNY, Rodriguez informed prison officials that he was a Native American inmate and an active practitioner of the Native American religion ("NAR"). He received a chrono (i.e., a memorandum) documenting his religious property and his status as an active practitioner of the NAR. He was elected to one of the two leadership positions in the NAR on B-yard.

Rodriguez attended a meeting on February 11, 2010 at which eight inmates, correctional officers, a sponsor and a chaplain were in attendance to discuss NAR services. *Id.* at Ex. 3. It appears that the inmates from both the A-yard and B-yard were working together in February 2010 and were united in their dissatisfaction with the way their requests were being handled by Ms. Grisotti, the community partnership manager. *See id.* (group inmate grievance and individual citizen's complaint).

In or about April 2010, the NAR groups from A-yard and B-yard erected a sweat lodge in B-yard for use by both groups together, which numbered about 70 inmates total.

In April 2010, the By-laws & Constitution of the Native American Inter-Tribal Hoop (the "Bylaws") were created and signed by five inmates listed as the "CTF-North Council Members

of NAIH." Amended Complaint, Ex. 4.[1] There also were signatures of five prison officials listed as "Administrative Signatures" on the Bylaws; Rodriguez alleges that the signatures showed approval of the Bylaws by those five prison officials. Amended Complaint, p. 5. One of the prison officials who signed was E. Medina, who was listed as Native American Sponsor for the prison. Amended Complaint, Ex. 4.

The Bylaws defined membership in a way that excluded Rodriguez, whose ethnicity was Hispanic. Specifically, the Bylaws provided:

Membership of the Native American Inter-Tribal Hoop (NAIH) shall be comprised of Native American inmates who wish to participate and have verification of Native American ancestry:

A. Certified Degree of Indian Blood (CDIB).

B. Federal enrollment number from any tribe that is recognized by either the federal government, individual state or local government.

C. A certified letter from any Indian tribe or tribal enrollment office.

D. Identified by California Department of Corrections & Rehabilitation (CDCR) as an American Indian (AMI) and have supporting documents of native ancestry.

*Id.* The Bylaws defined the term "Indian" to mean an "individual of Aborigine Ancestry who is a member of an Indian Tribe," a "Native Alaskan" and a "Native Hawaiian Aborigine." *Id.* The Bylaws defined the term "Native American" to mean an "Indian," a "Native Alaskan," and a "Native Hawaiian Aborigine." *Id.* The Bylaws allowed for honorary membership for converts upon approval from the lifelong Native Americans and the spiritual advisor. Honorary members were permitted use of the sweat lodge if room permitted. *See id.*

The Bylaws further provided that the Bylaws "concerning practices will adhere to the guide lines set in place by . . . [t]he late Lakota Chief and Medicine Man, Archie Firelamedeer" as well as certain federal laws. *Id.* Lakota Chief Lame Deer had written the following guidelines about sweat lodge usage: "The following cannot enter the sweat lodge except on an individual bases: 1. A man who has raped a child, tortured and/or killed it. 2. A man who has

---

[1]Although the allegations of the amended complaint suggest that the designations of the inmate council were new in the Bylaws created in April 2010, four of the five designated members had the same designations in the memorandum of the February 12, 2010 meeting. *Compare* Amended Complaint, Ex. 4 *with* Amended Complaint, Ex. 3 (meeting minutes dated February 12, 2010).

beaten an older of the tribe or family, including his parents.  3.  A homosexual. In our tribe in the past a Winkte was a transvestite.  4.  Non-Indians can participate under certain guidelines. Fisrt (sic) they must attend the prison Indian organization meetings for 6 months, and at the Indian population's discretion they can participate."  Amended Complaint, Ex. 6.[2]

In June or July 2010, defendant Medina informed the attendees at a Talking Circle ceremony that prison administrators had approved the Bylaws, and had selected the five inmates as the inmate council for the NAR groups of A- and B-yards of the SNY.  Amended Complaint, pp. 5-6.

In the weeks after the Bylaws were handed out, the five members of the inmate council "started to behave like a gang when enforcing the Bylaws'" membership provisions.  *Id.* at 6. Rodriguez "approached Defendant Medina in an attempt to address the gang like behaviors of the inmate council to no avail."  *Id.*

After he received no help with his complaints, Rodriguez decided to temporarily stop participating in some NAR services but continued to participate in the Drum and Talking Circle ceremonies on B-Yard in the absence of defendant Medina.  He did some research, concluded the Bylaws were illegal, wrote a paper entitled "legal rights of all indigenous peoples," and shared that paper with members of the NAR group of B-Yard.[3]  In about April 2011, Rodriguez asked to be put back on the NAR religious services ducat list, and defendant Medina granted the request.

The inmate council asked to meet with Rodriguez when the members learned he was going to attend religious services.  Council members Linton and Mancebo offered Rodriguez the position of secretary in the council, but he "declined the offer and informed inmates Linton

---

[2]Lakota Chief Archie Fire Lame Deer (1931-2001) was a Lakota Sioux spiritual leader. *See* www.wikipedia.com (entry for Archie Fire Lame Deer), and www.lamedeer.org.

[3]Rodriguez's position paper stated, among other things, that inmates looking to become part of native spiritual "can and will experience some form of discrimination and most likely it will come from the natives within these circles."  Amended Complaint, Ex. 6.  The document expressed his disagreement with the membership criteria for the NAIH, and urged that the limitations on membership were forms of oppression.  Of the leadership, he wrote that "they fear your will to endure.  They are already defeated because they abuse what they cannot conquer (your spirit)!  Your life is their defeat!" *Id.*

4

United States District Court

For the Northern District of California

and Mancebo that he did not want no part in their wanna-be gang" and that he would file an inmate grievance about the Bylaws.  Amended Complaint, p. 7.   Linton and Mancebo then handed to Rodriguez the Chief Lame Deer Guidelines, which they claimed gave them the authority to enforce the Bylaws, including the right to exclude anyone from the ceremonies who didn't meet the guidelines of Chief Lame Deer or the Bylaws.

On May 18 or 19, 2011, and May 22, 2011, defendant Medina excluded Rodriguez because he was classified as Mexican from Mexico "at the direction of the inmate council specifically inmates Linton and Mancebo." *Id.* at 7-8.  About twenty other inmates also were excluded.

Rodriguez re-wrote his paper entitled "legal rights of all indigenous peoples" on June 1, 2011 after further research and handed it out to NAR members on B-yard.  *Id* at 8-9.[4]

On June 5, Rodriguez sent a memorandum to defendants Noll, Wilson, Amaya, Grisotti, Roberts and Medina hoping "to expose and stop the unconstitutional behaviors of the Native American religious group sponsor Defendant Medina and the gang like behaviors of the Native

---

[4]In this paper, Rodriguez took direct aim at the inmate council as he wrote to his fellow inmates:

> Brothers, this means that if you are from North, Central or South America you are truly Native Americans.  Therefore, do not fall into the stereotype that says that you have to be "AMI," or an enrolled member of a tribe that is recognized by a government in order to participate in the native American religious services (i.e., Sweat Lodge, Drum, Talking Circle, etc.)  This belief has been *fabricated by certain inmates* in the California prison system in order to exclude NON-"AMI" inmates (i.e., Black, Mexican, White, etc.) from participation in the Native American religious circles throughout the CDCR.  *These inmate's wanna-be gang behavior* is not that of a spiritual./religious circle.  *This behavior is not legal, nor are the excuses that are given to justify their behavior.*

Amended Complaint, Ex. 10, p. 2.  He also stated that anyone that required an inmate to prove his ancestry  to participate "is not truly living by the indigenous way." *Id.*  He also wrote:

> Brothers, the Constitutional Amendments, Laws, Cases and Title 15. Sections listed above are all being violated by the behaviors of CTF's Administration and the Native American Spiritual Circle Inmate Council.  Brothers, the Bylaws for the Native American Spiritual Circle are Currently unconstitutional, and any Bylaws for any Native American religious group in CDCR will be unconstitutional if you are discriminated against, because of your Race, Nationality, etc. Do not be fooled by the lies you are being told.  Brothers, you cannot enforce your rights alone. Unity brings change, do you want change?  If so, then LET's ACT by educating each other on our rights.

*id.* at 3.

5

United States District Court
For the Northern District of California

American inmate council." *Id.* at 9.  In his memorandum, he wrote that the inmates who were now on the inmate council had "misled your administration into approving the Bylaws for the Native American religious groups of North Facility.  The self-appointed inmate council . . . formulated the Bylaws and submitted them for approval without first discussing them with other members of the Native American religious groups on North Facilities." *Id.* at 11.  Rodriguez pointed to the membership criteria as the particular problem with the Bylaws.

On June 10, 2011, Rodriguez and another inmate met with defendant Roberts to discuss a note Roberts had received from inmates Linton (chairman of the NAIH) and Mancebo (secretary of the NAIH), that identified Rodriguez as a disruptive force in the NAIH.  *Id.* at 9 and Ex. 13.[5]  Rodriguez explained to Roberts that these inmates were "trying to intimidate" him (Rodriguez) into not challenging the Bylaws because if he did challenge them, those inmates "would no longer be the 'shot callers.'"  Amended Complaint, pp. 9-10.  He said the inmate counsel members were behaving as if the NAR groups "were gangs." Id. at 10.  Roberts said he "would take care of these issues," and that Rodriguez should meet with defendant Martinez to address the note, which also had been sent to Martinez.  Rodriguez and other inmates met with Martinez on June 13, 2011, and explained that when another inmate was denied entry to the sweat lodge ceremony, he looked to defendant Medina for help, and Medina walked away after stating "'I don't want any part of this.'" *Id.* at 12.  Later, Martinez said he had spoken to Medina and had scheduled a meeting for June 20, 2011 with Medina, and the NAR inmate council, and a representative from B-yard.  He told Rodriguez to meet with B-yard inmates and to designate a representative bring a list of their complaints to the meeting.

On June 14, 2011, Rodriguez was put in administrative segregation.  He was given a

---

[5]The May 31, 2011 memorandum from inmates Linton and Mancebo stated that Rodriguez "ha[d] been given every reasonable opportunity to participate in the N.A.I.H. but his behavior has only served to cause a disruption within this group."  Amended Complaint, Ex. 13.  The authors noted that Rodriguez had stepped away from the NAR group for a while in recognition of "the egregiousness of his actions, and did not want his actions exposed," but "is again becoming a disruption to our group by implying that the reason he has stepped away is somehow the fault or responsibility of the N.A.I.H. and particularly the N.A.I.H. Council.  He is continuing to attempt to manipulate, and stir up discontent within the N.A.I.H. membership. " *Id.*  The authors concluded that Rodriguez's "rants should be treated as evidence of his disruptive behavior" and were un-Native American.  *Id.*

CDC-114D administrative segregation unit placement notice that stated:

> On June 14, 2011, you . . . are being transferred from the CTF North Facility to the CTF Administrative Segregation Unit ("ASU") due to having enemies at CTF North SNY. [¶] Inmate Rodriguez, reliable confidential sources have provided information indicating that your disruptive behavior has caused a serious conflict within the CTF North, Native American Inmate population jeopardizing your safety, the safety of others and the security of the institution. [¶] Specifically, you are alleged to have participated in the trafficking of narcotics and have accrued unpaid debts. Additionally trafficking narcotics caused you to be ostracized by many members of the Native American population. In retaliation, you began to create dissension within the population by repeatedly spreading rumors and propaganda against influential members and inciting others to defy accepted religious practices. Your behavior has caused such disruption and divisiveness that many members of the Native American population believe that if you remain at CTF North SNY a riot will occur. As a result of your behavior, you have enemies within CTF North SNY. As such you are being placed in the CTF ASU pending review by CTF ICC.

Amended Complaint, Ex. 15.[6] He also was given four confidential information disclosure forms by defendant Olson, who told him defendant Wilson had ordered his placement in administrative segregation

Rodriguez asked for help from defendant Martinez, who said he would get an investigative employee for the hearing, but couldn't help him at the moment. Defendant Betancourt was assigned as his investigative employee and met with him on June 15, at which time Rodriguez made several requests for witnesses and documents for the hearing. Betancourt "did not perform his duties" as required by the regulation. Amended Complaint, p. 15. On June 15, defendant Martinez re-interviewed Rodriguez and informed him that he would be transferred to another prison. Rodriguez repeated to Martinez that he was being set up by the inmate council members, who were (in his view) "playing politics." *Id.* On June 20, 2011, defendant Heastie submitted a CDC-128B chrono recommending that Rodriguez be transferred to another prison because of the allegations against him. The chrono recommended a "non-adverse" transfer. Amended Complaint, Ex. 18.

On June 22, 2011, Rodriguez appeared at an Institutional Classification Committee

---

[6]The information about the dissent among the Native American population was new, but the other information was not. Rodriguez was already in the special needs yard due to safety concerns. As noted in the classification chrono written in October 2009 – long before the problem started with the inmate council – prison officials noted that Rodriguez "was originally endorsed SNY on 10/24/05, due to safety concerns that stem from his drug debts and being the victim of a stabbing assault." Amended Complaint, Ex. 1.

("ICC") hearing. He gave to hearing officers a document notifying the ICC and warden that he was going on a hunger strike to protest the violations of his rights.  The hearing recorder declined to document that he had provided the hunger strike notice to the ICC, and hearing officers allegedly denied him "the opportunity to participate, present evidence and/or a defense against the allegations," although that same paragraph recites the arguments that he did make at the hearing.  *See* Amended Complaint, p. 17.   Among other things, he told the ICC that all he was trying to do was to attempt "to expose the gang like behaviors taking place within the Native American religious groups on North Facility."  *Id.*

Rodriguez went on a hunger strike from June 22 - July 8, 2011.  Prison officials monitored his hunger strike.  *See id.* at 18-19, and Exs. 23-25.

On July 21, 2011, he appeared at another ICC hearing, after having received notice of it on July 17.  The hearing officials didn't document it sufficiently or listen to him well enough, although the chrono for the hearing does note that Rodriguez had expressed disagreement with his transfer due to violations of his constitutional rights.  Amended Complaint, p. 20.  The ICC recommended a non adverse transfer to another prison.  *Id.* at Ex. 28.

Rodriguez's inmate appeals and letter-writing about the NAR groups and the ICCs were unsuccessful.  During one interview, defendant Amaya allegedly acknowledged that the Bylaws were illegal and would be cancelled, although he later failed to respond to Rodriguez's memo that attempted to document the interview.  Amended Complaint, p. 21.

On September 8, 2011, Rodriguez was transferred from CTF to the prison in Corcoran.

## DISCUSSION

A federal court must engage in a preliminary screening of any case in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity. *See* 28 U.S.C. § 1915A(a).  In its review the court must identify any cognizable claims, and dismiss any claims which are frivolous, malicious, fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief.  *See id*. at 1915A(b).  *Pro se* pleadings must be liberally construed.  *See Balistreri v. Pacifica Police*

*Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements:  (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

Analysis of the adequacy of the pleading is made difficult here because of the way Rodriguez organized his amended complaint: about 25 pages of facts, followed by five pages of legal claims that lump defendants and legal theories together.  The conclusory style of legal claims portion leaves the reader guessing as to what his particular claims are in many places. The task is made even more difficult because the prevailing theme in the amended complaint is that defendant prison officials let inmates do things with which Rodriguez disagrees.  Rodriguez will be given leave to file a second amended complaint to attempt to state claims for relief against defendants.  The rest of this order focuses on the problems with the federal claims, as there must be a federal claim to give this court jurisdiction over the case.

A.    The NAR Membership Dispute

Rodriguez's religion claims are based on his exclusion from full membership in the NAR group in the Special Needs Yard.  There is a doctrinal dispute as to whether full membership in the NAR includes only lifelong Native Americans or also includes anyone who wants to practice the NAR.   The inmate council said the former; Rodriguez says it should be the latter. Rodriguez's allegations and evidence plainly show the decision that one had to fit certain criteria to be a member in the NAR was made within the NAR rather than by prison officials.  The Bylaws allegedly were created by NAR inmates, and those Bylaws set out the membership criteria based on guidelines from Lakota Chief Lame Deer, a spiritual leader of the NAR.

"'[T]he teachings endorsed and practiced by recognized spiritual leaders are not, and should not be, subject to governmental pressures, and the canons which underlie most of the world's denominations are typically thought to derive from divine, rather than worldly inspiration.'" *Florer v. Congregation Pidyon Shevuyim,* 639 F. 3d 916, 925 (9th Cir. 2011)

United States District Court
For the Northern District of California

(quoting *Montano v. Hedgepeth*, 120 F.3d 844, 850 (8th Cir. 1997)); *see also Bear v. Nix*, 977 F.2d 1291 8th Cir. 1992) (prison's exclusion of convert-inmate from NAR ceremonies after NAR consultant determined inmate was not eligible to partake in NAR ceremonies did not violate First Amendment).   *Florer* explained that the test to determine whether actions that cause the deprivation of a right are "fairly attributable to the state even though they were committed by private actors" involved two parts.   *Id.* at 922. First, the deprivation "'must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible.'"   *Id.* (quoting *Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (9th Cir. 1982).*   Like *Florer*, Rodriguez's case falters on this first step. In *Florer*, the Ninth Circuit held there was no state action when a rabbi on contract with the prison to provide Jewish religious services to prisoners refused to provide religious materials and services to plaintiff on the ground that he was not Jewish.   There, rejection of Jewish materials and services for the inmate was not the result of governmental policy, *see id.* at 922-23. Similarly, the determination that membership in the NAR was limited to lifelong Native Americans was made by the inmate council, following the teachings of spiritual leader Lakota Chief Lame Deer.   Rodriguez has not alleged anything suggesting that the NAR membership policy was governmental policy.   As in *Florer*, there were allegations that prison officials allowed the allegedly improper decision to be made, but there are no allegations that the government entity directly provided the item in question.   *See id.* at 923 (Jewish reading materials and Jewish services not provided by the prison itself).   Here, Rodriguez alleges that the sweat lodge he was excluded from was built by the NAR participants and not prison officials. Also like *Florer*, Rodriguez does not suggest that he was blocked by prison officials from accessing other religious communities or individuals.   *See id.*   Thus, Rodriguez's religion claims fail under the first step of the *Lugar* test.[7]

Rodriguez has presented his claims as a dispute within his religion, rather than state

---

[7]The second part of the *Lugar* test is that "the party charged with the deprivation must be a person who may fairly be said to be a state actor."  *Florer*, 639 F.3d at 922 (quoting *Lugar*, 457 U.S. at 837).  Here, the prison officials are state actors, but Rodriguez's allegations and exhibits plainly show they were not the makers of the allegedly improper membership decisions.

action preventing the exercise of his religion.  For example, Rodriguez does not allege that he made any efforts to organize a separate NAR group apart from the NAIH established by the Bylaws, or that prison officials blocked him from doing so.  He also does not allege any efforts to use the sweat lodge apart from the NAIH, or to make his own sweat lodge.  And he doesn't suggest he ever exhausted administrative remedies for any adverse decisions if he made such attempts.

It may be that Rodriguez has one or more claims other than that he was wrongly excluded from the NAIH by other inmates, which the foregoing paragraphs have explained does not state an actionable claim against prison officials.  Leave to amend is granted so that Rodriguez may attempt to state a claim against prison officials for a denial of his religious rights.  As to every defendant he seeks to hold liable, Rodriguez must name him/her in his second amended complaint and must allege his claim(s) against him/her.  In his second amended complaint, he should describe what each defendant did (or failed to do) that caused a violation of his constitutional rights so that each proposed defendant has fair notice of his allegedly wrongful conduct.  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (liability under § 1983 arises only upon a showing of personal participation by a defendant).

B.    <u>Ad-Seg Placement Before Transfer</u>

The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution protects individuals against governmental deprivations of life, liberty or property without due process of law.  Changes in conditions of confinement may amount to a deprivation of a constitutionally protected liberty interest, provided that the liberty interest in question is one of real substance.  *Sandin v. Conner*, 515 U.S. 472, 477-87 (1995).

When prison officials initially determine whether a prisoner is to be segregated for administrative reasons and a liberty interest of real substance is implicated, due process requires that they hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated, inform the prisoner of the charges against him or the reasons segregation is being considered, and allow the prisoner to present his views.  *Toussaint v. McCarthy*, 801 F.2d 1080,

11

**United States District Court**
For the Northern District of California

1100 (9th Cir. 1986).  Due process also requires that there be an evidentiary basis for the prison officials' decision to place an inmate in segregation for administrative reasons.  *Superintendent v. Hill*, 472 U.S. 445, 455 (1985); *Toussaint*, 801 F.2d at 1104-05.  This standard is met if there is "some evidence" from which the conclusion of the administrative tribunal could be deduced. *Id.* at 1105.

The amended complaint fails to state a claim for a due process violation in connection with the placement of Rodriguez in administrative segregation because it affirmatively shows that he received the procedural protections to which he was entitled to under federal law.  His allegations show that he was informed of the reasons segregation was being considered in the CDC-114D and the confidential informant disclosure forms provided to him on June 14, 2011, *see* Amended Complaint, pp. 13-14, and Ex. 14; that he was interviewed the next day regarding the allegations at which point he presented his view that he was being set up by inmates on the inmate council, *see id.* at 14; that he received notice on June 20 of a classification hearing that was held on June 22, 2011, *id.* at 16; at the classification hearing he presented his views, i.e., he "informed ICC members that all [he] was guilty of was, trying to do the right thing by attempting to expose the gang like behaviors taking place within the Native American religious groups on North Facility through education . . . [a]nd that the allegations made by the confidential sources [i.e., members of the inmate council] were only being made in an attempt to intimidate him (Rodriguez) from appealing/exposing the By-laws and gang like behaviors, *id.* at 17.  Further, as explained in the next section, his allegations and exhibits showed there was sufficient, reliable evidence to support the decision to put him in ad-seg pending his transfer.   The claim that the placement in administrative segregation violated his right to due process is dismissed.

Rodriguez's allegations that various regulations were not complied with and that he was not allowed the full panoply of rights that might exist for a disciplinary hearing do not aid his federal due process claim.  His placement in ad-seg was administrative, not disciplinary.  (Similarly, his transfer was administrative, not disciplinary.  *See, e.g,* Amended Complaint, Ex. 18 (noting that it was  a "non-adverse" transfer).  The procedures required by the Due Process Clause are less rigorous than those that must be followed when the inmate is put in segregation

for disciplinary reasons rather than administrative reasons.  *See Toussaint v. McCarthy*, 801 F.2d 1080, 1099-1100 (9th Cir. 1986), *cert. denied*, 481 U.S. 1069 (1987).  Also, the procedures required by the Due Process Clause are only those procedures mandated by federal cases; due process does not require that the prison comply with its own, more generous procedures or regulations.  *See Walker v. Sumner*, 14 F.3d 1415, 1419-20  (9th Cir. 1994).

For the same reasons described in the next section, any claim that the placement in administrative segregation was retaliatory is dismissed.  That is, Rodriguez's allegations and exhibits plainly show the placement decision was done in furtherance of a legitimate penological interest.

C.    The Transfer

Rodriguez contends that he was improperly transferred to a different prison.  The transfer itself did not violate his federal right to due process.  Prisoners have no constitutional right to incarceration in a particular institution.  *See Olim v. Wakinekona*, 461 U.S. 238, 244-48 (1983); *Meachum v. Fano*, 427 U.S. 215, 224 (1976).  A prisoner's liberty interests are sufficiently extinguished by his conviction that the state may generally confine or transfer him to any of its institutions, to prisons in another state or to federal prisons, without offending the Constitution.  *See Rizzo v. Dawson*, 778 F.2d 527, 530 (9th Cir. 1985) (intrastate prison transfer does not implicate Due Process Clause).  "It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."  *McKune v. Lile*, 536 U.S. 24, 39 (2002).   The claim that the transfer violated due process is dismissed.

Although a transfer is generally permissible, prison officials cannot transfer a prisoner from one correctional institution to another in order to punish or retaliate against the prisoner for exercising his constitutional rights.  *See Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995); *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985); *see, e.g.*, *Flanagan v. Shively*, 783 F. Supp. 922 (M.D. Pa. 1992) (transfer in retaliation for exercise of constitutional rights actionable under § 1983).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements:  (1) An assertion that a state actor took some adverse

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action

2   (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not

3   reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68

4   (9th Cir. 2005) (footnote omitted).

5          Rodriguez has pled himself out of a retaliation claim, as he has shown that the fifth

6   element cannot be established.  His allegations and the exhibits to his amended complaint show

7   that the transfer reasonably advanced a legitimate correctional goal of safety.   *See Wood v.*

8   *Beauclair*, 692 F.3d 1041, 1051 (9th Cir. 2012) (rejecting retaliatory transfer claim because

9   transfer of prisoner to another prison to distance him from two female officers who were

10  fraternizing with him contrary to prison policy reasonably advanced a legitimate correctional

11  goal).   He alleges that prison officials transferred him on the ground that his presence created

12  a risk to prison safety, specifically, that he had begun "to create dissension within the population

13  by repeatedly spreading rumors and propaganda against influential members and inciting others

14  to defy accepted religious practices.  Your behavior has caused such disruption and divisiveness

15  that many members of the Native American population believe that if you remain at CTF North

16  SNY a riot will occur."  Amended Complaint, Ex. 5.  He had enemies on the SNY.  *Id.*  His

17  allegations and exhibits show the concern for institutional safety to be well-founded.

18  Rodriguez's first position paper written in April 2011 claimed that the Bylaws were "illegal," that

19  the lifelong members were engaging in discrimination, that the limitations on membership were

20  "forms of oppression," and that the leaders "abuse what they cannot conquer."  Amended

21  Complaint, Ex. 6.  He circulated that position paper to other inmates and to prison officials.

22  Rodriguez's second position paper written in June 2011 ratcheted up the inflammatory rhetoric:

23  he wrote that the inmate council engaged in "wanna-be gang behavior," "fabricated" the

24  requirement the preference for lifelong Native Americans over other races and ethnicities, said

25  their "behavior is not legal," and urged that they were being untrue to the spirit of indigenous

26  peoples.  Amended Complaint, Ex. 10.  He repeatedly referred to the inmate council members

27  as acting like a gang in writings to prison officials, *see, e.g.,* Amended Complaint, pp. 9, 10, 22;

28  said inmate council members were "trying to intimidate" him, *id.* at 9; referred to inmate council

members as "shot callers," *id.* at 10; and (after his transfer was underway) asked for inmate council members to be subjected to discipline, *id.* at Ex. 34. Additionally, a couple of weeks before proceedings started for his transfer to another prison, two inmate council members had written a memo to prison officials complaining about Rodriguez's disruptive behavior and its adverse effect on the NAR. *See* Amended Complaint, Ex. 13. Rodriguez's writings and statements, along with the inmate council members' memorandum showed an escalating conflict among the inmates which had progressed far beyond polite discord. Faced with this information, plus reports from prisoners that a riot might erupt, prison officials decided to transfer him to maintain institutional security. Prison security is a compelling government interest, *see Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2000), and protecting inmate safety is required under the Eighth Amendment, *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials had a legitimate penological purpose in removing the source of the inmate friction in light of their constitutional duty to protect prisoners from violence at the hands of other prisoners. *See id.* at 833; *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005).

D.     Administrative Appeals

Rodriguez asserts claims against officials who failed to find in his favor on his administrative appeals. The failure to grant an inmate's appeal in the prison administrative appeal system does not amount to a due process violation. There is no federal constitutional right to a prison administrative appeal or grievance system for California inmates. *See Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996) (prison grievance procedure is procedural right that does not give rise to protected liberty interest requiring procedural protections of Due Process Clause). ; *Smith v. Noonan*, 992 F.2d 987, 989 (9th Cir. 1993). Prison officials are not liable for a due process violation for simply failing to process an appeal properly or failing to find in plaintiff's favor.

E.     Conspiracy Allegations

The amended complaint does not adequately allege any conspiracy liability because the

United States District Court
For the Northern District of California

15

United States District Court
For the Northern District of California

conspiracy allegations are mere conclusions. Conclusory allegations of a conspiracy which are not supported by material facts are insufficient to state a claim. *See Simmons v. Sacramento County Superior Court*, 318 F.3d 1156, 1161 (9th Cir. 2003); *Woodrum v. Woodward County*, 866 F.2d 1121, 1126 (9th Cir. 1989). "'A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage.'" *See Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) (citation omitted). A civil plaintiff "'must show that the conspiring parties reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'" *Id.* (citation omitted). A conspiracy is not separate cause of action under California law and instead is a way to hold additional persons liable for torts committed by others. *See Wyatt v. Union Mortgage Co.*, 24 Cal. 3d 773, 784 (Cal. 1979). Similarly, a conspiracy is not itself a constitutional tort under 42 U.S.C. § 1983, but "may enlarge the pool of responsible defendants by demonstrating their causal connections to the violation." *Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th Cir. 2012) (en banc).

Leave to amend will be granted so that Rodriguez may attempt to plead conspiracy-based liability for his claims. If he wishes to pursue any conspiracy theory, he must provide non-conclusory allegations sufficient to state a claim based on conspiracy-based liability. As to each conspiracy he alleges existed, he should explain the role of each defendant in the conspiracy. He needs to allege with particularity who made an agreement with whom, when the agreement was made, what the agreement was, and what the purpose of the agreement was. He also needs to identify the role of each individual defendant in these conspiracy-based claims.

F.  Injunctive And Declaratory Relief Requests

When an inmate is released from prison or transferred to another prison and there is no reasonable expectation nor demonstrated probability that he will again be subjected to the prison conditions from which he seeks injunctive relief, the claims for injunctive should be dismissed as moot. *Dilley v. Gunn*, 64 F.3d 1365, 1368-69 (9th Cir. 1995); *see also Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012) (same for claims for declaratory relief). In light of Rodriguez's

transfer to a different prison at which a different set of circumstances regarding the NAR will exist, his requests for injunctive and declaratory relief are dismissed as moot.

G.    Miscellaney

Rodriguez's motion for leave to file an amended complaint is GRANTED. (Docket # 6.) His amended complaint was filed.

Rodriguez has requested that counsel be appointed to assist him in this action. A district court has the discretion under 28 U.S.C. §1915(e)(1) to designate counsel to represent an indigent civil litigant in exceptional circumstances. *See Wilborn v. Escalderon*, 789 F.2d 1328, 1331 (9th Cir. 1986). This requires an evaluation of both the likelihood of success on the merits and the ability of the plaintiff to articulate his claims pro se in light of the complexity of the legal issues involved. *See id.* Neither of these factors is dispositive and both must be viewed together before deciding on a request for counsel under § 1915(e)(1). Here, exceptional circumstances requiring the appointment of counsel are not evident. The request for appointment of counsel is DENIED. (Docket # 2.)

## CONCLUSION

For the foregoing reasons, the amended complaint is dismissed with leave to amend. The amended complaint must be filed no later than **February 28, 2013**, and must include the caption and civil case number used in this order and the words SECOND AMENDED COMPLAINT on the first page. Plaintiff is cautioned that his amended complaint must be a complete statement of his claims. *See Lacey*, 693 F.3d at 928 ("For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal. But for any claims voluntarily dismissed, we will consider those claims to be waived if not repled.") Failure to file the amended complaint by the deadline will result in the dismissal of the action.

IT IS SO ORDERED.

Dated: January 31, 2013

_____
SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California